or 22-1707 U.S. v. Skinner. Okay. Mr. Scott. Thank you, Your Honor, and may it please the Court. My name is Hagen Scotten. I'm an assistant United States attorney in the Southern District of New York, and I represent the government in this appeal. On February 10th, 1989, William Skinner and other members of his gang gunned down Efren Cardenas on a residential street. Cardenas was unarmed, not violent, and had been on good terms with Skinner's gang, which is how they lured him to his death. After Skinner and his accomplices shot Cardenas seven times in the head, nine times in the body, and seven times in the arms and legs, they rifled through his pockets, stole a briefcase of cocaine, and left Cardenas to die. Over 30 years later, Cardenas' children came to see Skinner sentenced for murdering their father. Skinner had spent about six years in jail, spread out over four decades as he fought various state and federal charges arising from his role in killing Cardenas. He had finally pled guilty on the eve of a federal trial. And the same day that Skinner faced justice for murdering Cardenas, he walked out of jail with a time-served sentence. That sentence was substantively unreasonable under this Court's precedent. Okay, just so we're clear, he was sentenced to 73 months. He was sentenced to a time-served sentence of 73 months. That's exactly right, Your Honor. Yeah, he was sentenced to 73 months. Exactly, Your Honor. It's not as though there was no punishment exactly for that. That is correct, Your Honor. Our submission is not that he received zero punishment, it's that he received a drastically inadequate punishment. And there's four reasons, if I could, Your Honor, or at least, that I think this Court could look at, although I'm happy to hear Your Honor's question also. Sure, go ahead. So the first is simply that the sentence of 73 months for the premeditated murder of a defenseless victim is shockingly low and damages the administration of justice. The second is the District Court imposed that sentence based on speculation that a material fact differed from the undisputed record, which this Court found erroneous in Mamouni. The third is that the District Court sentence creates a huge and unwarranted disparity with other sentences for similar crimes. And the last is that the District Court relied on the fact that Skinner had not committed additional felonies after murdering Cardenas to the exclusion of other sentencing factors, as this Court has repeatedly found erroneous in cases such as Mamouni. Is that really a fair characterization? I know in the briefing it says very often that it suggests the district judge was not considering all the factors, but if you look at the sentencing minutes, the district judge very clearly indicates and specifies all of the relevant sentencing factors. He talks about not just Skinner's background and history, he talks about the seriousness of the offense, of deterrence. I just don't think it's accurate to say that he didn't consider those. Now perhaps you take issue with how the judge weighed those, but I don't see support for the idea that the relevant sentencing factors were not considered. I agree with you, Your Honor, and to the extent we indicated we didn't think he considered them, I think that would be a procedural challenge, and we're not bringing a procedural challenge here, Your Honor. Our claim is not that he failed to think about other factors, it's that he didn't weigh them adequately. So in Caesar, for example, this Court noted, and it's page 88 of the Caesar opinion, that the district court there also noted the seriousness of the offense and discussed it, but still found that inadequate in a substantive reasonable challenge because it then essentially gave inadequate weight to it and overemphasized one factor, there as here, this idea of rehabilitation. And I think you can really see, Your Honor, that the... The problem is we can't be a sentencing court. I mean, in the sense that there's a range. District judges have discretion in sentencing. So, you know, we might balance things differently where we're sitting as a district judge. But that can't be the rule. I think that's exactly right, Your Honor. And we are not asking this Court to do a rebalancing. We're asking this Court to... It falls outside of the range of reasonableness, you're saying. That's exactly right, Your Honor. And I think the key piece of this Court's doctrine that we're invoking in that area, Your Honor, is this Court has repeatedly said, says all the time, that it will examine whether any given factor, as explained by the district judge, can bear the weight assigned to it. And that really is the core of our submission, that this single factor, this lack of future felonies, cannot bear the weight of a 73-month sentence for this crime. We certainly, I think, have shown, it's really not disputed... Have you made any errors in his reasoning or thinking about the case that he indicated as he was opposing the sentence? I think there is one error in reasoning that I want to stress right now, which is because it's of the type that was recognized in Mamouni. So, when he's discussing how he composed the sentence, and this is the beginning of the district court's reasoning, he says, I've looked at my two other sentences in murder cases, and they're meaningful to me here, they provide important context. He then goes on to say that one of those earlier cases, and later he'd say it was both of them, not, and I'm quoting now at page 151 of the appendix, not unlike the situation here, involved the battle between two gangs for narcotics territory. That is entirely unlike the situation here. There is no dispute that Cardenas was not a rival of Skinner, that he was no threat to Skinner. Is that really, though, because if you look at the entire passage, I don't think the judge is indicating that this was sort of a shootout among rival gangs. I mean, he's talking about the context of these, what the situation was like during this time period, and that the judge had seen these types of drug rivalries and shootouts and all of that, but I don't think the judge is actually indicating that he thinks that some kind of rival drug shootout is going on here. He acknowledges that Cardenas was not armed, and that this was not, I don't know, perhaps your argument is that he's considering that context too much, and that's not the situation here, but I don't think it's the case that the judge is mistakenly thinking that that's what's happening here. Well, so I agree with Your Honor to the point that he does also, when he continues to talk about what he calls this cowboys and Indians back-and-forth violence, he does also clearly have some thought of Skinner being caught up in this culture of violence. But respectfully, I mean... Yes, but Skinner's caught up in the violence generally, but I thought that you were going to argue that this case wasn't a cowboys and Indians case because the victim wasn't armed and wasn't violent, and so it wasn't a shootout between two armed people. That is exactly what I'm going to argue, Your Honor, and respectfully, Judge Lee... But the question is, did the district judge somehow think that this was that kind of case as far as Cardenas was concerned? At the time of Skinner's sentencing, I think there is every reason to believe he did. First off, in response to Judge Lee's question, I mean, he literally says it. I can't read his words, not unlike the situation here involved the battle between two gangs for narcotics territories. It is hard to read those differently than the meaning I'm ascribing to them, but I think equally relevant, Your Honors, is that was the interpretation that we understood at the time. We put it in our opening brief. It was not in any way disputed in the response brief, and I think that's particularly meaningful here because the response brief was written... What was the understanding at the time? That that's what the district court was thinking or everybody understood this to have been? Everyone in the courtroom that day, as best I can tell, heard Judge Ramos, the way I am now saying he spoke, to say literally that this was, and I'm just quoting again, similar to a battle between two gangs for narcotics territory. And I think particularly meaningful on that is the fact that the response brief was written by Mr. Goldzer, who represented... Is it really right that the district court wasn't relying on the idea that the murder itself was part of a gang rivalry in order to give a more lenient sentence? Because he says, if I were only punishing the act itself, I would give a 20-year sentence or maybe more. And it's because of the lack of need for deterrence and rehabilitation that happened after the fact  acknowledge. Is the district court really relying on his characterization of the original act in order to justify the sentence? It is not. I agree with Your Honor that it's not that he says, well, this wasn't that bad, and so I'm going to impose a lower sentence. But I think what you do see here, Your Honor, I guess one way to look at it is if you flip the circumstances. Imagine an 18-year-old defendant is convicted of attempted murder, receives a discretionary life sentence way outside the guidelines, like this sentence, way outside the nationwide norms for that, and in imposing that sentence, the district court says erroneously, well, I'm imposing this life sentence on this 18-year-old for attempted murder because the victim was entirely defenseless. And suppose it was undisputed by the parties that the victim was not at all defenseless and had been part of a rivalry. I don't actually think there's any real question that this court would then send that case back for resentencing. I mean, I think that's a pretty distinct hypothetical, though, because it assumes, again, that that is what the basis of the sentencing is. And here, these comments about the being in the drug culture, as Judge Monash was suggesting, that wasn't the basis of Judge Ramos' decision here. And as I said, I perhaps do still take issue with your characterization that he is suggesting that that's what was going on here. But I think that's, again, we know specifically why the judge gave the sentence, because he was very particular about saying what the basis for the sentence was. So, I'll get to Mr. Goltzer's point. Mr. Goltzer heard him say it. He wrote a response brief. If we were wrong about that, he would have said it. No one in this court thought he wasn't saying that this case was like a rivalry. But taking your Honor's point that the affirmative explanation, and I agree with that, is the rehabilitation. It's not really the lack of need for specific deterrence. And I can say that confidently, because if you look at pages 198 and 238 of the appendix, which are the sentencing of the co-defendants, Judge Ramos also acknowledged that those defendants, who are also now in their 50s, did not require any specific deterrence. Well, but he also, in those defendants' sentencing, made a point of noting that in this 30-year period, they had committed other crimes, including, I think, one of them that committed a murder subsequent to this. And so, the judge very much recognized that in that 30-year period, of these three defendants, the other two defendants were distinct. Absolutely. We're not arguing that these three defendants are identical. I'm simply saying that it wasn't the specific deterrence that drove the reasoning. It was, and I agree with Your Honor here, this notion of 30 years without committing a felony. That simply cannot bear the weight, and a couple points on that first. This Court does not habitually defer to a district court's finding of extraordinary rehabilitation, whether you look at the cases cited by the defense, Warquan and Gall, or the cases we mentioned. That's supposed to be a relevant factor, though, isn't it? It's absolutely a relevant factor. What I will say, Your Honor, is this Court will then look at, okay, what was the rehabilitation here, and was it extraordinary such to bear the weight of the sentence? And what it said in Carpenter, Your Honor, was, achievement of the ordinary responsibility of citizenship is not extraordinary. And so in Carpenter, it sent the case back for resentencing, because although the defendant had done what this defendant did in many ways, he had gotten a job, he had ceased committing crimes, and, in fact, had done something that this defendant didn't. The defendant in Carpenter was caught by a store clerk, immediately admitted his crime, and told the store clerk who his co-contributor was. That's ordinary. Not committing future federal felonies, good, it should be considered. It certainly does put him in a better light than his co-defendants who committed other murders. But it cannot bear the weight of a time-served sentence for a premeditated murder, because... How much weight can it bear? So, since you're saying that there is a distinction between Skinner and his co-defendants, it would justify a disparity between them, right? It could. I should say it is very difficult to compare their sentences, because the district court also took into account for the co-defendants is they had served vastly more time in jail than Skinner for those crimes. It's not as though they had been unpunished for those other crimes. To the contrary, especially, for example, you see at the Brooks sentencing, Judge Ramos... But doesn't that tell you that there's more of a need for specific deterrence in those cases, because they have a more extensive criminal history? All I can say, Your Honor, is the district court, as you see particularly from Merced, says, I accept that I do not need to deter Mr. Merced, that he's not going to do this again. You accept the specific deterrence? That's right. We agree that across the board there was not a need for specific deterrence. On the other hand, Your Honor... Across the board with all the defendants? With the three defendants. The district court said that. We did not contest it. We haven't contested the other two sentences on appeal. And I should note, Your Honor, that the 3553A factor is not the need to afford specific deterrence. It's rather the need to afford deterrence, which this court has said repeatedly, most recently, I think, in a published opinion called Davis in 2023, that a huge component of that is general deterrence. You know, you could consider both, right? So there's specific deterrence and general deterrence, but if the two defendants with an extensive criminal history get very severe sentences and the one defendant who has spent 30 years without a criminal history gets a six-year sentence plus house arrest and supervised release, I mean, is that really going to lead people to think that they could commit intentional murder and not be punished? Well, it seems to be a fairly widespread judgment of courts that greater sentences are required. As I think we've shown in our brief, the sentence here really is a complete outlier with other sentences for premeditated first-degree murder. And I did want to draw the court's attention to one case. Can I just, I mean... Yes, Your Honor, please. The statistics that you mentioned about the degree of variance from the average sentences and other first-degree murderers that have sentences within this range, that those involve different circumstances, it's very difficult to compare those things because we are talking about individualized sentencing here. And so to say that, well, these 10 cases where someone was convicted of first-degree murder and they got something comparable, those were different because it had this, that, and the other, it's, this is a very, in a lot of ways, unusual circumstance, this meaning this particular case. And so to point to the fact that there are these other cases that you can compare and say, well, this is too low or this is too high, I just find that not helpful. And I, in particular, both at that end and the reverse, that there are so many cases where a judge has sentenced well above the average sentence for a comparable offense. And then we have, in those cases as well, said, look, this is, you know, is this an abuse of discretion and can we just look at numbers and say, well, that's how we know this is an abuse of discretion because it's 70% or this percentage. It's just the numbers make it difficult when we're talking about individualized sensing. Well, I agree with Your Honor that numbers alone are not all you can look at, but I actually think this court... That's what you presented to us. We don't know each case. Of those cases, there was, I have, there were, the average of the 10 lightest, you said, of those cases in those days were 276 months. There were 9 that were 180 months or more, and one was 120 months, and that's as low as it got. Is that, am I correct on that? That is, just from my recollection... But we don't know any of the facts of those cases and why, whether they differ from this one, whether the guy was a recidivist in some way or you know, what kind of a life he led after, afterwards, whether there was rehabilitation. In fact, aren't there some cases where there's some kind of significant mitigating circumstance where the defendant does get a comparable sentence? Well, I suppose, I think the answer to that one is no, Your Honor, not on the record for this court. I mean, we put forward no comparable sentences. The response pointed out no comparable sentences. So I think the answer for this court's purpose is no, and I guess this is responsive to all three of your questions, but particularly Judge Lee's about what does this court do? I think Your Honor should look at United States v. Chenkin, 854 F. 3rd. 181, where it does exactly what I'm suggesting here, except in the opposite direction. In that case, the sentence was found to be substantially unreasonable as too high. The court looked at nationwide statistics, exactly the same sentencing commission statistics I'm saying here. It did the numbers. It said there the sentence was about 77% higher than the average, which is almost exactly what we have here. Ours is a little further off. It's about 21%. And the court acknowledged that, you know, look, obviously this is an individual defendant and it  as the other. It even acknowledged, I think, something that Your Honors are driving at. It's, look, every defendant has unique factors and Jenkins had some aggravating factors, which is, you know, supported the sentence because he had gone to trial and he had apparently been just very abusive towards the judge. And this court said, we take those as a given. We're still going to compare him to the nationwide statistics for child pornography defenders, which is what he is, with, or was, with the same guidelines. And it found that very meaningful. It relied on it heavily in finding a sentence substantially unreasonable as too high. So I think what I'm urging here, Your Honors, just to follow settled precedent. That settled precedent does say, don't just do statistics. But here, we're not just outside statistics. We're way outside the guidelines. The defendant in Jenkins was actually within the guidelines and the court still found his sentence substantially unreasonable. And we do have this sort of failure to appreciate the gravity of the offense, which this court found to be a symptom of substantive unreasonableness in the moot. It's not just that, you know, the spectacle of somebody who was convicted or who pleaded guilty to a crime, but it's also the fact that he was in a courthouse. So if the district court had sentenced him to, you know, one or a single-digit number of years in prison so he didn't get to just walk outside, it still would be below the nationwide averages, right? Correct, Your Honor. And I don't know if we would still be here today had it been a nine-year sentence. What I can say is this court consistently in its substantive unreasonable doesn't say, but nine years would be reasonable. It just sends it back for resentencing. And I haven't been able to find a case where the court hasn't sent something this back where it's, again, outside statistical norms, outside the guidelines. There is a real seriousness of error as to weighing the seriousness. And I should point out, Your Honor, you said that, I think somewhat correctly, that all three defendants committed the same crime. It is important to note that the Merced and Brooke sentencing, the district court sort of corrected itself and explained very clearly that Cardenas was unarmed and not a threat. He did not, by the way, Your Honor, say that Cardenas was unarmed at his sentence, at the Skinner sentence. And there were sentences afterwards. There were sentences afterwards. And look, in all fairness, obviously given the result in Skinner, we made a particular point to say, Your Honor, that may have been a mistake because the PSR said it. It was not that it wasn't in the record. But Judge Ramos did appear to miscomprehend it fairly severely in exactly the same fashion as Mamouni, where again there was an undisputed fact there that there had been an attempt to murder a federal officer. And the district court sort of speculated that maybe there wasn't a true intent to kill. Very similar to here. Speculation that facts were what they were. And this court said that is a symptom of substantive unreasonable. In fact, this court was shocked. But speculating about what an individual's intent was at the time they committed the crime, that's not what's going on here. What you're describing as the district judge's speculation is your characterization of how he is I guess perceiving what happened here and that his purportedly mistaken sort of view of the nature of the crime. That's very different when you're talking about sentencing someone because you question what their intent was, whether or not they intended to commit the crime versus is the judge mistakenly thinking that the nature of this crime was something slightly less serious than what it was. I don't know that the mistake that what you're characterizing as a mistake here is comparable to a mistake that goes to the individual defendant and whether or not they committed the crime and whether or not they're actually guilty of attempted murder or what was that issue there. Well, of course, I agree, Your Honor. That's not the identical mistake. But I think it is materially similar. In both cases, it was a fact that was actually undisputed. And to be clear, in Mamouni, it wasn't the court doubted that the defendant had stabbed a federal agent, not hurting him, fortunately, because of his protection. It was that there was no dispute in either case of what was going on. Murder of defenseless victim, attempt to kill federal agent. And in both cases, the district judge took something undisputed and said, well, maybe it really wasn't that way. And I do think, I think most judges would say it's not a minor difference. I think many judges regard this very material, whether you're killing some, ambushing and killing somebody who is no threat to you, or you're in some sort of mutual rivalry where the victim might have done the same to you, had he had the chance. And you can see that partly in the different sentences for the defendants. He does impose different sentences once Judge Ramos sort of comes to a full understanding of the facts. So your view is that when he sentenced Skinner, he didn't understand the circumstances, but when he comes to the other defendants, he did. Judge Ramos made quite a point at the later two sentencings of how Cardenas was, in fact, a defenseless member. Are Skinner's sentences inconsistent then? Skinner's versus Merced and Brooks? I would say similar to what this court said There were different circumstances apart from the nature of the crime. I think I would say, similar to what this court said in Caesar, is that they are unsupported and contradictory. I'm not saying that on a correct understanding of facts, you couldn't still have a different sentence for the defendants. The government itself at the other sentences said that there were differences between Skinner and the co-defendants. Skinner was a relatively low-level member of the Stroke Conspiracy who did not have other murders or shootings in his criminal history after the murder of Efren Cardenas. You talk about people, their criminal histories and so on. So low-level member and also the criminal history. So the government acknowledged that there were differences between the defendants, right? We did, Your Honor. I think what Your Honor may be looking at is at page 215 of the appendix. I think we went out of our way to make clarity of sentencing. We thought a 20-year sentence was available for all three. Now, of course, after we got a result that we thought was bad in Skinner, we went out of our way to stress aggravating factors to defendants to try to get a better sentence. You're saying you think the District Court made a mistake in sentencing Skinner and you just were trying to prevent that from undermining the sentences for the other defendants? Correct. So of course we were going to stress the aggravators and distinguish the sentence for the District Court. But even then, we made plain to say, now we're not saying Skinner's sentence was correct. In fact, we think it should have been much higher. I'd also note that there were factors for Skinner that were aggravating. Skinner committed this murder while on probation for a prior federal felony, which is generally thought to be very aggravating that somebody ambushes and slaughters a defenseless person while on probation, while the court system is trusting them. Even the District Court acknowledged that Skinner's criminal history understated his criminal conduct. And Your Honor, if you take the point that he held a relatively low rank in the Bush-Davis gang, that's coming from the cooperating witnesses. You can see it in the pre-sentence report. You have to take everything they also said. They also said Skinner was involved in trafficking significant amounts of drugs. He was involved in other robberies, other violence. He carried a gun. If you take all that together, it's not that it paints a flattering picture of him. Skinner is not, and never claimed to be, a first-time offender, someone who wasn't generally committing many violent crimes. This is a person who was fully normal. I don't have that argument. We've taken you beyond your time. But you have time for rebuttals. We'll hear from you again. Thank you, Your Honor. Let's turn to the appellee, Mr. Pinto. Good morning. May it please the Court, I'm Nicholas Pinto. I represent defendant Appellee William Skinner. I was assigned this case after George Goltzer fell ill, and I just want to recognize his great work throughout his years. I don't know if it's appropriate here, but I think George deserves a little recognition. I apologize, and I'll move forward. Your Honor, first and foremost, we're talking about the standard of review on this. This is a substantive reasonableness of this case, and appellate courts give due deference to the district courts of sentencing decisions, taking into account, I think you've all reiterated that factor a couple of times. Just to respond, first and foremost, to one of the government's main arguments. This is not a I'm going to say that again. This is not a 73-month sentence. As much as the government would like to characterize this as a 73-month sentence, if William Skinner was sentenced to 73 months, he would be serving 85% of that. He would be eligible for a year to 18 months of home confinement, work release, and other programs. So this sentence, adding to it the 12 months of home confinement, and then adjusting for 85%, this is at least a 100-month sentence. The U.S. Attorney just sat here and said, if this were 9 years, we might not be here today. If the defendant was sentenced to 9 years, I don't know that it would have been any practical difference between the sentence Well, I think he meant 9 years after the time served. That was the question. The question was about whether he could walk out of the courthouse on the same day. I don't know if he was saying that if it was 9 years total, including time served, they wouldn't be here. But I take your point. So you could at least say that this is... And then adjust accordingly for he served 30 months of that in the MCC, which was closed. Specifically... So you're saying that because it's time served for the 73 months, and therefore he can't be eligible for some of these programs, it's effectively longer than 73 months? Correct, Judge. This is not... Doesn't he also get a benefit from it being time served? Because he doesn't have to go back to prison? I mean, it's not like... If he could trade the time then or the time now, he necessarily would take the deal that it would be better to do it now because he would get the advantage of these programs. I think my point is, Judge, we're comparing this 73-month sentence to their statistics, which they pointed at numbers. And I'm saying that the number is inaccurate because if the court sentenced William Skinner to 100 months, that the results here would probably not be practically no different. Let me ask you this. If the judge had said 100 months, and then it had gone back, he was credited for the time served, would they just turn around and release him at that point? Or would he have to serve some time? Maybe a few additional months. I'm not 100% sure, Judge. Who knows? I mean, you get credit for 15%, but what triggers that 15%? It's once the POP does their calculation. We have no idea what this would be. How the POP would handle it. We also know that he had a stellar disciplinary record, which goes to his character. He would be entitled to full advantage of every program and every ounce of good time credit. You're making this argument that actually it wasn't a 73-month sentence, it was effectively a 100-month sentence. Does that mean that you think that if it were a genuine 73-month sentence, that would be shockingly low? I'm not saying that, Judge. I don't think it would be either. Let's proceed on that assumption. Isn't it somewhat shocking that somebody is convicted of an intentional murder while on probation and then gets to walk out of the courthouse the same day? Judge, I have to point to the court's reasoning behind this. I think that this is a unique situation. One of the arguments that the government has raised is that this is going to damage the administration of justice. I don't think these situations come up on a regular basis. I know they point to one or two cases, but this is really an anomaly. What's so unique about it is that he didn't commit another murder in 30 years? It's that he walked out of the courtroom after being acquitted of these charges and he turned his life around on his own. You know, the government doesn't have an issue with giving cooperators breaks on this. We're rewarding cooperation, and we're not rewarding a true transformation of a human being. Well, cooperation is something that you provide, some benefit you provide to the government that you don't necessarily have to provide. I mean, isn't not committing other murders or felonies a sort of baseline expectation of all people just living in society? You know, Judge, I understand your point. One of the things that Judge Ramos pointed out is that we expect people to do this, but we need to take into consideration where Mr. Skinner came from. It was more difficult for a person like William Skinner to get to the norm than other people. He was beaten with an iron at the age of eight. He was beaten with extension cords. He had a mother who was an alcoholic. He had a father who was a narcotics addict. He witnessed the murder of his brother. How many defendants do you think come to us or the district courts who have similar stories and not all of them stick with crime? Some of them do change. Prison experience changes them. Your client was in jail for a period of time. It changes them. They make up their mind they're going to live a different life when they get out, and then they do. You know, it's not unheard of. I don't think it's common, Judge. I think this is an extraordinary case. I think Judge Ramos viewed it as an extraordinary case. He looked at it that way, but that's really an anecdotal way of looking at it, a particular case. He was obviously moved by what the defendant had accomplished and his personal life was definitely different than when it was when he was 17 years old. But why wouldn't that be the baseline though, as Judge Benashia suggested? We don't expect less. You know, it's one thing if you've gone out and, I don't know, saved three people from a fiery building that's going up or done something heroic or, I don't know, started a business and created 2,000 jobs or something of that sort. This guy just lived a relatively crime-free life. I mean, there wasn't one offense in there, which is very minor. But, you know, he came to that determination. Because when you're 17, maybe your brain isn't fully developed and then by the time you're a little older you feel differently and you've had that break and so rather than going back into the streets where you were, you don't do it anymore. But that isn't totally unusual it seems to me. I understand your point, Judge. I think that it is something, I think it was extraordinary. When they're 17 years old he was in the highest category of recidivists. We look at BOP statistics, the 18 to 24 year range, that's the highest rate of recidivism. And he didn't. He defied those odds. He got away from Brooks, he got away from Merced. And just, I see my time is running out. I just want to make sure. It's okay. We kept the government above the times. So don't worry about that. What do you mean he got away from them? He just didn't associate with them anymore? Correct. He walked away from that whole life. And just to point out the vast differences between these gentlemen, and I'm going to say these are the words of the government, not mine. Merced was the murder plot for Cardenas. He continued to commit crimes throughout his entire life. He served 17 years in prison and he resumed his involvement in drug trafficking as soon as he got out. Mr. Skinner was a low-level member of a conspiracy. This is the government's words, not mine. The government described Brooks as... The government doesn't say that, but that's not the reason why. The government says that in the sentencing of the co-defendants later, in order to still obtain a higher sentence for them than Skinner got. But the basis for the sentence of Skinner was not that he was a low-level member of the conspiracy. It was that he hadn't committed another crime in 30 years. Correct, Judge. I bring that up. And you're saying even if not committing a crime would be a baseline expectation for somebody who had a kind of privileged upbringing, you're saying because he was in a situation where you might expect him to be committing more crimes, we should regard it as an extraordinary achievement? Well, if we look at what Mr. Skinner did, he was released from prison, he got low-level jobs, and he worked. He could have easily gone back to like Brooks and Mercer did. But if he had committed more crimes, that would be aggravating factors, and it would just have been a higher sentence, right? So just the absence of crimes is, you think, a mitigating factor? I mean, isn't the absence of crimes the baseline? It should be, Judge. It should be. But I'm comparing him to his co-defendants. Right, and they got higher sentences because they had a more extensive criminal history, right? Right. And one of the arguments that the government is making is that this is a shockingly low sentence. And I'm saying to you, together with the fact that, you know, with good time and programs, while the government will characterize this as a 73-month sentence, it's not technically a 73-month sentence. Because if he was given 73 months, he would be eligible for other things. He would have served five years in prison. Well, why isn't it shockingly low that upon conviction for an intentional murder, he just goes home? Well, Judge, he did plead guilty to a drug conspiracy with the murder as an aggravating factor. I'm not sure that that has a... His plea was to a 841b1c, which is a... Okay, I get that. But the circumstances of it, it was an intentional murder, right? The circumstances of the commission of that offense. Right? Yes, Judge. Okay, so... Yes, Judge. Okay, so then why isn't it shockingly low that he doesn't even go to jail for a day after the conviction? Judge, he went to jail for... He had a significant sentence. To say he didn't go to jail for a day longer than... I understand your point, but he was punished. He was punished, and I know that... Well, he received the same punishment in terms of prison time that he would have received had he never been convicted, right? Because this was all time served related to the first arrest, the earlier arrest. So if there had been no conviction, he still would have served that 73 months in prison because it was in the past. Well, now part of it, though, I guess, was pretrial detention on this offense. In this offense. He served 30 months... Yes. Oh, no. Okay, so how much... That's a good point. So how much time is it, pretrial detention, for this offense? It was 30 months, but my argument to you is that it was in the MCC when it was... Right before it was closed, it was horrendous conditions. Conditions described by Judge McMahon as worse than a Colombian prison camp. There were stories about defendants living in... I'm just talking about baseline expectations. I mean, we don't really say that the bad conditions in the prison... I mean, that's a problem for the Bureau of Prisons and so on, but we don't say that that makes it an extra punishment. Well, courts in this district have analogized it to saying that each day in these pre... in the local jails are the equivalent to a day and a half in a place where someone would be designated because of lack of movement. Your answers to my questions are, and I say, well, why isn't it shockingly low if it's a 73-month sentence? It's not really... It's really kind of a 100-month sentence and I say, well, isn't it low that he walks out of the courthouse and doesn't go back to prison and you're saying, well, actually he spent time in prison conditions that were substandard and that should count against him? I mean, it seems like you're actually trying to make it seem like the sentence was higher than it was. And doesn't that just kind of concede that actually it's a pretty low sentence and it's pretty shocking for somebody who committed an intentional murder? Judge, when I'm making those arguments, we're talking about data. We're talking about numbers. The government is pointing at 73 months and saying that that's low. That number is low and I'm trying to... If we're comparing it to a 99-month sentence that... I'm saying that you can't compare the numbers. It's impossible to compare the numbers plus the fact that... Sir, you can't compare what numbers? The data that the government has... All the other murders that they came up with, the lowest of which was 120 months, the average of which was 276 months and there were 310 of them were life. I said, why can't you compare them to those? Well, those numbers don't give any... Those are just plain numbers. They don't give any facts and they don't give any individual... In a gross way, there's nothing like this case. And you don't know that they had aggravating factors. You don't know... As Judge Medish said, you don't know what those cases... You don't know what's behind those numbers. Oh, you did? I'm sorry, Judge. I apologize, Judge. I don't want to take credit. I... I think what Mr. Skinner did here was... was... was remarkable. I think that from where he started, I don't think you should be able to find... If he had been convicted ultimately just five years after the commission of the murder, let's say the new evidence came to light not 30 years later but five years later, could he have received a 73-month sentence and it wouldn't be too low? I don't know, Judge. Or is it the fact that he spent so much time? Well... I mean, even within the first five years he went and got a job, right? And was not committing more crimes. So, I think this goes to Judge Ramos' point. If we were talking about just punishing the act, that's one factor. It's one thing. And yes, there... Judge Ramos said there's no more serious crime than murder. We're not just talking about punishing the act. We're talking about an individualized sentence. And you can't... I don't think you can look at the number without looking at the 30 years in between and what Mr. Skinner has done in those 30 years. Right, but I guess I'm saying you know, if it were five years, he would also look at those five years, right? And maybe the fact that he went and got a job and was acting responsibly might count in his favor. But I'm saying, would you have given him a... would it have justified a I... I think it's... I'm having difficulty answering your question because I think one of the biggest components here is the length of time in the 30 years. What do you think of the judge kind of talking about this being, you know, a war between drug dealers and that this was typical of that kind of a situation and it was so... quid pro quo or tribalist unions or whatever you want to call it. When in fact that wasn't anything like this case. This guy was unarmed. He had not... he wasn't a violent person. They had... It wasn't just an intentional murder. It was deeply premeditated. They planned to kill him and steal what he had and they didn't, you know, they sort of competed with each other about how many shots were going to be fired at this guy and I think there were a total of 21 hits on him. And it's a different kind of murder. This is cold-blooded, premeditated, not just intentional, but really premeditated. Why doesn't that deserve a considerable amount of consideration, it says. Judge, to your point, I thought you were making about whether the judge made an error on this. I think it was clear in the pre-sentence report. I think the facts that he was unarmed was in the pre-sentence report. I think it was in the government submission. I am going to expect that Judge Ramos relied on that and read that and was aware of that and I think the comments that the government is pointing at are just him describing the time that this was... It says it expressly that it's comparable to gang war, but in fact the pre-sentence report says it was not. Why shouldn't we ask him to clarify whether he relied on that characterization? I don't think anything in his decision. He was pretty clear on his decision. We wouldn't be suggesting a sentence. It would be up to him to be sentenced and take into consideration and balance and do all of the things explicitly and arrive at a sentence. The government would get a second bite at the animal. That's essentially what we're talking about. It may come out that it's shockingly low of a second time. I doubt it, but it could happen. Your Honor, I don't think this is shockingly low. I don't think that his sentence is shockingly low. I'm looking at the totality of his sentence and everything that... It's not shockingly low particularly. I think that Judge Ramos, he examined all of the 3553 facts. I think Judge Lee, you pointed that out. But your adversary is saying that there was greater weight given in Brooks and Burson's case. Your Honor, I've made that argument to this panel on the other direction. I think that they're entitled to their argument and they're entitled to feel that way. But I don't think he did. He was clear in his comments. He talked about the seriousness of the offense and he said clearly... He wasn't clear in his comments because you just said, well, even though he said that about the circumstances that it was comparable to a gang rivalry that you assume that he relied on the characterization in the pre-sentence report. He didn't explicitly say that. He didn't describe those circumstances. He described different circumstances. In his sentence, he would say up front, I read the pre-sentence report, I read the submission, so I have to assume that he read it on that. I don't think that his... You just said he was clear, but that's not clarity. That's just a presumption to be given in favor of district court that they understood all the evidence before them. But if he described it expressly in a way that diverges from the pre-sentence report, that's a reason for thinking that maybe he didn't. I don't believe he described it differently than the pre-sentence report, and it certainly wasn't something that he relied on. He was clear on that this was... If he was punishing Mr. Skinner solely on the act, it would be a 20-year... He would give him the maximum sentence he was allowed to give him. So I think he understood... So that's a range between 20 years and 173 months or whatever. The reduction was down to 73. And the sentence could have fallen anywhere on that range, 20 years down to 15 or 12 or whatever. There's a whole range there. And my question is, I didn't get a real sense of balance from reading his comments. I did get the fact that he referred to the 355-3A factors, which contain all of the various elements that we're talking about. But the careful balancing, I didn't really sense that. I think that when you look at the sentence given to Brooks, who was the gangs enforcer who committed murders prior to and after, if you look at that sentence in comparison to Skinner's, I don't think that anyone can expect Brooks and Skinner to get the same sentence. Particularly looking at, when we're looking at individualized defendants and individualized circumstances and peoples and cases, there's no way that Skinner should get the same sentence as Brooks. Brooks continued to commit crimes afterwards and committed murders before and after. I don't think they decided the same that he should get the same sentence. Well, that's 15 years. Well, they did. They thought everybody ought to get Correct. And I would expect nothing less of the government than to say that. Yeah, but that's been frustrated already with the other two sentences, because one of them got less. I know that I've... I don't think we would be here, frankly, if you'd been sentenced to 150 months. With time served for half of that. But anyway, that's... Just to... Let me see. If you want to make one final point, that's fine. Yeah, I know I've gone over. I just want to make sure I... I don't want to leave anything out. You know, we go back to the... I guess I want to go back to the words of Justice Stevens, say the defendants in Gaul, just reiterating that the defendant's post-offense conduct indicates that he will neither return to criminal behavior or defend as a danger to society. In fact, his conduct was not motivated by a desire to please the court or any other governmental agency, but it was a pre-indictment product of his own desire to lead a better life. I think that's something that should be rewarded. I believe it is the goal and the end product of our penal system. I think that making people like William Skinner is what we are aspiring to. And to say that none of that matters, or it doesn't matter a little bit, it's wrong and it's not... it's the wrong thing to do for justice, I think. Okay. I think we have that argument. Thank you, Mr. Pinto. We'll hear back from the government honorable. Thank you, Your Honor. I think I have three points and I'll try to be brief. I'll pick up with Gaul, where my opponent left off, and a couple of Your Honors got to this general point that where you see extraordinary rehabilitation, it usually means you did something above and beyond, just not committing crimes, and that's exactly what the Supreme Court was describing in Gaul that my adversary was quoting from. Mr. Gaul did not leave the drug trafficking organization because he was arrested for murder, which is what was the impetus for breaking Skinner away. He left voluntarily. He got a job before ever being prosecuted for anything. When law enforcement officers first came to Mr. Gaul before he was charged and said, weren't you involved in this, he told them everything. When he heard he would be indicted, he went to turn himself in and tried to give more information. When law enforcement said, your information is redundant, which we have, he said, all right, let me plead guilty immediately. That looks absolutely nothing like Mr. Skinner, who not only fought the case tooth and nail, he acknowledged his responsibility so late in the game, he didn't even get the full credit for accepting some of the guidelines, which as Your Honors probably know, is almost every defendant gets. So, Your Honors, to the extent that's your view, you're absolutely correct. This Court's cases recognize extraordinary rehabilitations being something of and beyond just not committing crimes. In fact, the statistics show... So you're saying in this case if Mr. Skinner had accepted responsibility and pleaded guilty just at the beginning when he was first arrested, that would be extraordinary rehabilitation and that would justify this sentence? I don't... No, Your Honor, I'm not saying that because I think in that case you'd still have... The comparable indication would be had he done it in 1989 when the police came to him and said, hey, we heard you're involved in a murder. If he said, yes, I was involved in a murder, can I please tell you who my co-conspirators were? Let me help you do justice for Mr. Cardenas. That would be equivalent to... He was arrested, though, and went to trial and was acquitted of that. So it's not as if he sort of... You're almost describing it as an obstruction of justice type of situation back in 89 when this happened. That wasn't the case. He was arrested by the state. He went to trial. He was acquitted of the murder, convicted of a weapons possession and served time for that. I agree completely, Your Honor. I am not saying he obstructed justice or did anything inappropriate. I'm saying he did what is ordinary for defendants to do. He availed himself of all his rights and he's allowed to do that, even to wait until five days before trial and to see what the witness testament against will be before saying, okay, I'm beat. I'm going to plead guilty. You're allowed to do all of that. It's ordinary. It's just not extraordinary. And that's what this court's cases have demanded if you're going to get this kind of discount. Two other quick points, Your Honor. One, my adversary offered a couple justifications for the district court sentence that are nowhere found in the district court's reasoning. This is not one of these areas where the court can affirm any basis. It's very clear this court reviews the district court's reasoning as explained by the district court. Maybe Judge Ramos would rely on those on remand. Maybe he would not. But they're not before the court now. What reasons are you referring to? Well, he said that the conditions were very harsh in prison. There are courts in our district who have taken that into account. The sentence being effectively longer than 73 months. That is the other one, exactly. Judge Ramos did not say those things. I get that point. Correct. What's the third point? And the final point is just a very minor factual correction so there's no confusion. We're not saying, we did say and I think we still think that similar sentences for Brooks and for this murder. I just want to be clear about Brooks. Brooks served 22 years in prison for the other murder he committed before he ever showed up before Judge Ramos. And it was a part of his sentencing that in addition to the 15 years he was going to get for the murder of Cardenas, he was going to serve an indeterminate sentence of 12 to 36 years for the other murder he committed. Mr. Brooks is essentially going to spend his entire life in jail because he committed three murders. That's not inappropriate but it also doesn't suggest that Mr. Skinner needs a discount just for the one murder. The one terrible and callous murder that he committed. Okay. Thank you very much Mr. Scotton. Thank you, Your Honor. The case is submitted.